(359) This is an application on behalf of two gentlemen to be admitted to the bar of this State, both of who are aliens; one, it is understood, is now and has been for some time resident in South Carolina, and the abode of the other has been in this State for a year past; but both have signified their intention to renounce their allegiance to their present sovereign and to become naturalized citizens according to the laws of the United States. Their claim to an examination has been asserted on the ground of right; and if the act of 1777 shall, according to the usual rules of interpretation, appear to convey a peremptory direction to the Court to examine them, we can only yield obedience to it, however striking might be the mischief and impolicy of such a course of legislation. It is very true, as argued, that the act referred to does not in terms prescribe citizenship as one of the qualifications for admission to the bar; but neither does it profess to enumerate all the qualifications; nor does it appear to be mandatory to the judges to admit upon the applicant's possessing the *Page 197 
qualifications enumerated. The words are, "That no person (360) coming into this State from any other State, or from any foreign country, with an intention to practice the law, shall by the said judges be admitted to practice as an attorney, unless," etc. The last sentence of the clause provides: "That upon such qualification had, and oath taken, they may act as attorneys during their good behavior." That this act was predicated upon the assumption that the applicants should be citizens of the State, according to the existing laws, when they applied, seems plain from the provisions of a law passed at the very same session, according to which all persons above 16 years of age, after a week's residence in the State, were compellable to take the oath of allegiance. The neglect or refusal to do this subjected the party to a compulsory departure for the West Indies or Europe; or, if permitted by the county court to remain in the State, he was adjudged incapable and disabled in law to have, occupy or enjoy any office, appointment,license, or election of trust or profit, civil or military, within the State, and shall not be capable of being elected to or aiding by their votes to elect another to be member of Assembly, and shall not, by themselves or deputy, attorney or trustee, execute any such office, trust or appointment, and shall be disabled to prosecute any suit at law or equity, or to be guardians, executors or administrators; with a variety of other disqualifications enumerated in the act of 1777, secs. 8 and 9, Iredell's Revisal. Thus it appears that a simultaneous legislative act, with that regulating the admission of attorneys, disqualified all persons from holding or obtaining a license who either refused or neglected to become citizens according to such ceremonies as the pressure of the times enabled the Legislature to prescribe. In looking at the extent and severity of these disqualifications, carried far beyond what the common law annexes to alienism, it is but an act of common justice to the Legislature of that day to connect with our reviews the circumstances under which the enactments were made; for however justly they might be considered as subversive of the customary law of nations if (361) passed in a time of tranquillity, yet the new government had in truth more to dread from the disaffected inhabitants within the bosom of the country, from those who have owed a common allegiance to the same sovereign, than from aliens in the ordinary sense of the word; and it was an object of vital importance to the great experiment then about to be made that those who were hostile to the new order of things should be deprived of all participation and sinister influence in its progress. Under general principles, however, my opinion is that none but citizens are contemplated in the first act, and that its necessary and genuine interpretation is to exclude aliens. The middle state in which the common law places a denizen is unknown here, except it exist in *Page 198 
the right to hold lands immediately upon taking the oath of allegiance. The State may prescribe the terms upon which an alien may be enabled to hold lands within the limits of the State, and that part of the Constitution of the State must still retain its force (sec. 30), while the latter branch of the clause, prescribing the terms of citizenship is annulled by the Constitution of the United States and the naturalization laws passed in pursuance thereof. With this single exception, all persons (I mean to speak only of free white persons) residing here are either citizens or aliens; the former, whether native or naturalized, being entitled to equal rights, with the exception of eligibility to the office of President, which is confined to those who were citizens at the adoption of the Constitution of the United States. Aliens, on the other hand, owe only a temporary allegiance, and have no rights but such as are deducible from the law of nations, the most important of which are defined and incorporated in the municipal codes of most civilized countries, or such as are secured by treaties between different nations. An alien may claim to live in a foreign country without injury or molestation; but he cannot justly assert the municipal rights (362) and social privileges of a natural citizen. It is laid down by writers on the civil law that whenever a foreigner travels out of his own country he can only claim the benefit of the law of nations, having no right to the law or privileges of any particular place. Some discrimination is made in the law of every country between citizens and aliens, and though the advance of commerce and civilization has everywhere mitigated its ancient severity, yet there is not at the present day any nation in which the restraints on aliens are milder or less vexatious than in this, none in which a plenary admission to the rights of citizenship may be more easily obtained. No conditions are required which the safety of the Republic does not demand, and which may not be performed by all, rich or poor, who are likely to become useful members of society.
Whatever discretion resides in the judges relative to the admission of attorneys ought to be exercised with a view to the advantage and security of the suitors in the several courts; for to them the license is a guarantee that in the opinion of the magistrates signing it the licentiate is politically, not less than legally and morally, qualified to transact their business. Yet in the event of a war being declared between the United States and any foreign nation or government, the authority under which he practices would not protect the subject of such government not actually naturalized "from being apprehended, restrained, secured, and removed as an alien enemy," to the great injury, possibly the ruin, of numerous clients. 3 Laws U.S., 84. Even the judges of the State themselves might become the instruments of such *Page 199 
apprehension and removal out of the State under the second section of the same law. No one should be presented to the public under the panoply of such a license against whom an injured suitor would not have the full benefit of such legal remedy as the laws of the State provide in the event of fraudulent or negligent practice. Act of 1743, ch. 37, R. C. N. But such a suit brought against an alien attorney for such a (363) cause might if the matter in dispute were of sufficient amount, be removed to the Circuit Court of the United States, and by possibility thence to the Supreme Court of the same Government. There is no profession relative to which the public good more imperiously requires that its members should duly appreciate and honestly maintain the freedom, the purity, and the genuine spirit of our political institutions. These are so blended and interwoven with the civil rights of the citizen, they present themselves in such an infinity of relations as additional abutments to the several charters of property and personal security, that it is difficult to conceive how a professional advocate, owing foreign allegiance and cherishing alien prejudices, can usefully vindicate principles in the abhorrence of which he may have been nurtured; how, on many important occasions, the most brilliant forensic talent can be successfully exerted, unless they are sustained and inspired by an ardent patriotism. The excellence of every human system of laws consists as much in their administration and practice as in the theory itself. Viewing the profession of the law as the source from which the superior judicial magistrates must be derived, and from which a large proportion of enlightened and efficient public officers is usually selected, every one must naturally feel solicitous that it should not fall into such hands as would lower it in the National opinion. It would be difficult to avoid this consequence if aliens were entitled to admission, for legal acquirements and private worth may subsist with inveterate prejudices against the principles of our Government. In such an arrangement society would cease to derive that benefit from the profession which it now affords, by supplying a continual succession of men qualified and worthy to preside in the courts of justice. No longer a nursery in which merit is trained under the directing hand of experience and qualified to render manly and essential services to the community, the legal profession, "in its nature the noblest (364) and most beneficial to mankind, in its abuse and debasement themost sordid and pernicious," would sink into a mere mercenary instrument, without sympathy in the public prosperity and without hold on the public confidence.
PER CURIAM. Application denied.
Cited: In re Applicants for License, 143 N.C. 9, 32. *Page 200